# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

PEOPLE v CHRISTIAN
PEOPLE v EDWARDS
PEOPLE v HINTON

Docket Nos. 162354, 162355, and 162374. Argued on application for leave to appeal March 3, 2022. Decided July 27, 2022.

Kino D. Christian, Joshun Edwards, and C'Quan M. Hinton were found guilty of murder by a jury in the Genesee Circuit Court in 2007 and sentenced to life in prison. Defendants' direct appeals were unsuccessful. In 2014, Joshun Edwards's family filed a request under the Michigan Freedom of Information Act, MCL 15.231 *et seq*., for documents related to the case. Among the documents provided in response to the request was a transcript of the first interview with the prosecution's main witness, Jarylle Murphy, which the prosecution had not provided to defendants. Defendants moved for relief from judgment under MCR 6.508, arguing in part that because there were inconsistencies in the interview transcript that could have been used to impeach Murphy's testimony at trial, the prosecution's suppression of the transcript violated their constitutional right to exculpatory evidence under *Brady v Maryland*, 373 US 83 (1963). The court, Joseph J. Farah, J., denied the motions, ruling that although the prosecution had failed to disclose favorable evidence to defendants before trial, the evidence was not material and, therefore, reversal was not required. The Court of Appeals, LETICA, P.J., and K. F. KELLY and GADOLA, JJ., affirmed in an unpublished per curiam opinion issued October 22, 2020 (Docket Nos. 348753, 348807, and 349585). Defendants sought leave to appeal in the Supreme Court, which directed and heard oral argument on the application for leave to appeal. 507 Mich 952 (2021).

In an opinion by Chief Justice MCCORMACK, joined by Justices BERNSTEIN, CAVANAGH, and WELCH, the Supreme Court, in lieu of granting leave to appeal, *held*:

The interview transcript that the prosecution suppressed was both favorable and material to the defense. Having established both good cause for failing to raise the issue on direct appeal and actual prejudice for purposes of MCR 6.508, defendants were entitled to a new trial.

1. Motions for relief from judgment are governed by MCR 6.508 *et seq*. A defendant bringing their first motion for relief from judgment has the burden of demonstrating two things. First, under MCR 6.508(D)(3)(a), they must show good cause for having failed to raise the grounds that they allege warrant relief on appeal. One way to establish good cause is by showing that an

external factor prevented appellate counsel from raising an issue on direct appeal. Second, under MCR 6.508(D)(3)(b), they must show actual prejudice from the alleged irregularities that support their claim for relief. "Actual prejudice" for a convicted defendant means either that, but for the alleged error, the defendant would have had a reasonably likely chance of acquittal, or that there was an irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand, regardless of its effect on the outcome of the case.

2. To establish a *Brady* violation, a defendant must show that the prosecution has suppressed evidence that is material and favorable to the accused. In this case, the only element of defendants' *Brady* claim that was in dispute on appeal was materiality. To establish that exculpatory evidence is material, a defendant must establish a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. A defendant need not demonstrate by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal; rather, the relevant question is whether the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence. This standard is legally simple but factually complex, and whether the standard is met must be evaluated in the context of the entire record. Suppressed evidence may be material if it would have raised opportunities to attack the thoroughness or good faith of the underlying investigation.

3. Defendants demonstrated good cause for not raising the issue of the missing transcript on direct appeal because doing so was prevented by an external factor, namely, that the prosecution had suppressed the transcript. Defendants also demonstrated actual prejudice from the fact that the prosecution did not provide them with the transcript. The transcript was material because it would have provided more substantial impeachment evidence than any of the evidence defendants were provided, it would have undermined the other prosecution evidence and supported the defense theory, and it called the thoroughness and good faith of the investigation into question. To prevail at trial, defendants needed the jury to believe that Murphy was not telling the truth, and the suppressed transcript would have provided more support for their strategy than the evidence that was known to defendants at the time of trial. The transcript, which documented the first statement that Murphy gave to the police and the one closest in time to the crime, differed from Murphy's trial testimony and his other statements in eight important ways: the time line of events on the day of the shooting, discrepancies regarding the possible motive, the failure to mention a van that figured into Murphy's later accounts, whether there was a girl present at the shooting, whether it was a shooter or the victim who was on a bicycle, whether Murphy and the victim were sitting down or walking when the shooters approached, discrepancies regarding how well Murphy could see, and where Murphy fled after the shooting. Despite the fact that Murphy's story was inconsistent with itself and with the physical evidence, it served as the basis for the prosecution's case. Had the suppressed transcript been disclosed, there is a reasonable probability that the result of the trial would have been different. It would have been powerful impeachment evidence of Murphy, the prosecution's central witness, making defendants' argument that he was fabricating his story more likely. And if the jury did not believe Murphy, the other evidence would also have been less believable. The state's suppression of the transcript called the thoroughness and good faith of the investigation into question. Because the transcript was material, defendants were prejudiced by its suppression, and but for this *Brady* violation, defendants would have had a

reasonably likely chance of acquittal. Having established both good cause and actual prejudice, defendants were entitled to a new trial.

Reversed and remanded.

Justice CLEMENT, joined by Justices ZAHRA and VIVIANO, dissenting, agreed that the prosecution's failure to provide defendants with the transcript constituted suppression of favorable evidence under *Brady*, but she disagreed that the evidence met *Brady*'s materiality requirement because its impeachment value was limited and other inculpatory evidence admitted at trial corroborated defendants' guilt. She noted that Murphy's narrative was largely consistent each time he gave it, including the chronology of his movements on the day in question and the descriptions of the shooters, and she stated that the inconsistencies appeared to be the result of frailties in human recall rather than organized mistruths. Accordingly, she would have denied Christian's and Edwards's applications for leave to appeal. However, she would have remanded Hinton's case to the trial court for an evidentiary hearing on his ineffective-assistance-of-counsel claim, which was based on trial counsel's failure to call two alibi witnesses. She explained that although Hinton's appellate counsel technically raised an ineffective-assistance argument on direct appeal by moving for a remand, the motion was denied because it failed to identify any particular deficiency for which factual development was required. Under those circumstances, she did not believe the procedural bar of MCR 6.508(D)(2) should apply.

# OPINION

Chief Justice:
  Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED July 27, 2022

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v                                   No. 162354

KINO DOMINIQUE CHRISTIAN,

    Defendant-Appellant.

_____

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v                                   No. 162355

JOSHUN EDWARDS,

    Defendant-Appellant.

_____

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v                                       No. 162374

C'QUAN MICHAEL HINTON,

        Defendant-Appellant.

BEFORE THE ENTIRE BENCH

MCCORMACK, C.J.

One of the foundational principles of our criminal legal system is that the state cannot keep evidence from the accused—especially exculpatory evidence. The United States Supreme Court said so long ago in *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), but you don't have to go to law school to understand that fundamental fairness requires the government to disclose evidence that calls an individual's guilt into question when it charges them with a crime. The legal test for determining whether relief follows the government's failure to give an accused exculpatory information isn't as intuitive, however: the suppressed evidence must have been "material."

Determining whether suppressed evidence is material is always a fact-driven task. As the United States Supreme Court has said, it can be "legally simple but factually complex" to sort out whether " 'there is a reasonable probability that, had the [suppressed] evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Turner v United States*, 582 US ___, ___; 137 S Ct 1885, 1893; 198 L Ed 2d 443 (2017), quoting *Cone v Bell*, 556 US 449, 470; 129 S Ct 1769; 173 L Ed 2d 701 (2009); see also *United States v Bagley*, 473 US 667, 682; 105 S Ct 3375; 87 L Ed 2d 481 (1985).

In this case, the prosecution suppressed the transcript of an interview with its most important witness. The transcript reveals that what the witness said in the interview differed from a later interview and the testimony he provided at both the preliminary examination and at trial. Because the suppressed evidence undermines the prosecution's star witness's testimony—testimony which is the thread that ties together the rest of the evidence—it meets the materiality threshold.

Because the prosecution suppressed evidence that was both favorable and material to the defense, the defendants are each entitled to a new trial.

## I. FACTS AND PROCEDURAL HISTORY

On October 9, 2007, 14-year-old Robert Person was shot on a street corner just outside Flint. The prosecution eventually charged four men in connection with murder: Kino Christian, Joshun Edwards, C'Quan Hinton, and Dartanion Edwards. The jury found all four guilty of premediated murder and other charges, and they were sentenced to mandatory life in prison. Because Hinton was 17 at the time of the shooting, he was resentenced in 2015 pursuant to *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012), to a term of 32 to 60 years' imprisonment.

In 2014, Joshun Edwards's family filed a request under the Michigan Freedom of Information Act, MCL 15.231 *et seq*., for documents related to the case. Among the documents provided in response to the request was a transcript of the first interview with the prosecution's main witness, Jarylle Murphy, which had not been provided to the defendants.

3

Three of the defendants—Kino Christian, Joshun Edwards, and C'Quan Hinton—filed motions for relief from judgment. MCR 6.500 *et seq*. They argued in part that the prosecution's suppression of the interview transcript violated their constitutional right to exculpatory evidence—that is, that the failure to provide it violated *Brady*. The trial court denied the motions, holding that the prosecution suppressed the transcript, and that it was favorable, but that it was not "material." The Court of Appeals affirmed. *People v Edwards*, unpublished per curiam opinion of the Court of Appeals, issued October 22, 2020 (Docket Nos. 348753, 348807, and 349585), p 6.

A. CRIME SCENE EVIDENCE AND EARLY INVESTIGATION

Around 8:00 p.m. on October 9, 2007, Robert Person was shot to death at the corner of South Averill Avenue and Lippincott Boulevard in the Flint suburb of Burton. The Evergreen Regency Apartments, which many witnesses mentioned, are located at the southwest corner of the intersection. The Ten Eleven Market, which also featured in some witnesses' testimony, is located about a block east of the crime scene.

The police recovered 35 shell casings from the scene and conducted DNA analysis on two of them. None of the defendants' DNA profiles were present, but the DNA profiles of three unknown male donors were identified. Sergeant Sergio Thomas, who responded to the crime scene, testified that the shell casings were found in front of an apartment building on the east side of Averill, and that a trail of blood droplets led west on Lippincott and stopped at the entrance of the Evergreen Regency. The police also found a bike in a parking lot located at the northwest corner of the intersection.

4

The police found a car near the scene with a bullet hole in its side after the shooting and spoke with the driver, Ashlie Dye. Dye told the police that she saw a boy alone on a bike at the time of the shooting but had not seen the shooter(s).

The next day, the police spoke with Person's good friend, Anthony DeJon Williams. Williams told the police that he and Person spent the afternoon and evening together. After playing football at the Evergreen Regency Apartments, they went to a store on Lippincott with a couple of girls. On their way to the store, a gray van approached them. Person told Williams, "Don't look back." On their return from the store, the van began to follow them and Person told Williams to leave with the girls because something bad would happen. Shortly after, Williams walked away with the girls, went into a nearby apartment, and heard gunshots. Williams was not called to testify at trial by any party, and there is no evidence that the police ever located or spoke with the girls.

## B. JARYLLE MURPHY'S POLICE INTERVIEWS

### 1. OCTOBER 2007 INTERVIEW

About a week after the shooting, on October 16, 2007, 15-year-old Jarylle Murphy showed up at the police station and claimed he had witnessed the shooting. He arrived carrying a piece of paper with detailed descriptions of four shooters that included each shooter's skin tone, hair color, clothing, height, and age. For example, he described one of the shooters as about 5'11" to 6'0" with dark skin, black hair in long braids, a goatee, both ears pierced, wearing gray Dickies, a black shirt, black Jordans, a do-rag, and a black and gray hat. He also provided a drawing that showed the placement of the four shooters and a description of their four guns: two handguns, one AK-47, and one TEC-9. It is unclear when Murphy wrote the descriptions and made the drawing: a police summary of his

5

interview said he did it the night of the shooting, but at trial, Murphy testified that he wrote the descriptions and made the drawing the night before he came to the police station.

Sergeant Lee Ann Gaspar interviewed Murphy, and Murphy explained that on the day of the shooting, he got on a bus with his sister, Shamonica Murphy, at 6:30 p.m. They then went to "the Bricks," an apartment complex, to "talk[] to her uncle for a minute." Murphy told the police the complex was off of Lapeer Road and 12th Street by the railroad tracks.

After the visit, Murphy said that he and his sister walked to the Evergreen Regency Apartments, which is about 1.9 miles from Lapeer and 12th. While walking around the apartment complex, they ran into Person, whom Murphy's sister knew, and she introduced them. Murphy said that all three went back to Person's apartment to get something to eat. Murphy said that his sister's friends came to pick her up in a van around 7:30 p.m. And at some point after that, Murphy and Person linked up with a girl with long black hair.

Murphy said he and Person headed up Lippincott toward the bus stop, but did not explain why they went there. It's unclear from the transcript whether the girl was already with them or if they met her later. As the two (or maybe three) of them were walking back from the bus stop, two men approached them around 8:00 p.m. One of them asked Person, "You the dude that snitched on my moms?" According to Murphy, Person and the two men argued. As the men left, one threatened that they would be back.

And that's what Murphy claimed happened next: the same two men, and two more, returned about an hour and a half later, around 9:00 p.m. or 9:30 p.m. They approached from behind; three on foot and one on a bike. Murphy explained that he looked back and "they started drawing their guns." He urged Person to flee and then ran away toward the

6

middle of the Evergreen Regency complex. Murphy was not sure whether he was alone with Person when the shooting happened, or if the girl was still with them. When asked if she was there for the shooting, he said, "I think so." But he was sure that they were sitting on the sidewalk when the shooters approached. When asked if he could see the shooters he said, "Not really, it was kinda dark."

Although Murphy's interview contradicted Anthony Williams's account to the police from the day after the shooting, the police never asked Murphy about Williams. Nor is there evidence that the police asked Williams about Murphy or that the police spoke to Williams again before the trial.

## 2. NOVEMBER 2007 INTERVIEW

Sergeant Gaspar interviewed Murphy again on November 8, 2007, and he provided some different information about the day of the shooting than he did in his first interview. He described going to the Haskell Community Center to play basketball around 4:30 p.m. with his cousins. He played a couple of rounds of pool there and then headed to the store. On the way, he ran into his sister and made a plan to go to South Flint to see her uncle. The two traveled to the uncle's house. But rather than stay "for a minute," as he claimed in October, they stayed "[m]aybe for 30 minutes."

Like he said in his earlier interview, Murphy described walking with his sister the 1.9 miles to the Evergreen Regency Apartments, meeting Person, and walking around with him. But Murphy added some important new information: While he was walking with Person, a brown and gray Dodge van pulled up with four girls in it. Person retrieved a phone charger and a purple and gray bike from the back of the van.

7

Murphy said that around 7:00 p.m., two men confronted them. One of the men, named Tony, asked Person, "Why you go and snitch on my brother?" After that, a girl came up to talk with Person for about 30 minutes, but she left before the shooting occurred. Person and Murphy started walking on Averill and were almost to the corner of Lippincott and Averill when four men approached them from behind. Murphy said Person was pushing his bike at the time. He heard gunshots and began running. He said he "couldn't see them really good," because all he did was "turn around and take a glance." He said that two of the four had confronted them earlier and all of them had guns.

3. INFORMATION DISCLOSED TO THE DEFENDANTS BEFORE TRIAL

Before trial, the prosecution gave the defendants the transcript of Murphy's November interview, but not the transcript of Murphy's October interview; instead, they gave the defendants a police-created "summary" of that interview. And that summary was incomplete in some places and false in others. It misstated Murphy's time line. It claimed Murphy said the shooting happened at 8:00 p.m., which was what he said in November—but not what he said in October, which was 9:00 p.m. or 9:30 p.m. And while Murphy said in that October interview that one of the men accused Person of snitching on his mom, the summary erroneously states that Murphy said they accused him of snitching on a brother—again making the summary consistent with his November interview.

The summary also excluded important details from Murphy's October interview. It did not include Murphy's statements about the bicycle or the girl, so the defendants never knew that Murphy said one of the shooters was on a bicycle and Person was not, or that he said a girl was with them when the shooting happened. Nor did the summary mention that

8

Murphy claimed they were sitting on the sidewalk at the time of the shooting, that he could not see the shooters because it was "kinda dark," and that he fled to the middle of the Evergreen Regency Apartments after shots were fired.

Murphy testified at the preliminary examination. His testimony largely tracked his November interview but like that November interview, was inconsistent with the October interview suppressed by the prosecution.

## C. TRIAL EVIDENCE

### 1. MURPHY'S TESTIMONY

Murphy's trial testimony was largely consistent with his preliminary examination testimony, his November statement, and with the false and incomplete police summary of his October statement—that is, it largely tracked the previous statements he made that were provided to the defendants. But it was inconsistent in many important ways with what he said during the October interview.

Murphy testified that his afternoon on the day of the shooting began at the Haskell Community Center, where he played basketball for 30 to 45 minutes. He said he ran into his sister on the way to the store and decided to go with her to see her uncle on the south side of Flint. In contrast to his November interview, when he said he was playing basketball at 4:30 p.m., he said they arrived at her uncle's home around 4:30 p.m. But his time line contrasted more starkly with what he told Sergeant Gaspar in October, when he claimed he did not board the bus to travel to the uncle's home until 6:30 p.m.

Murphy testified that he and his sister walked to the Evergreen Regency Apartments and she introduced him to Person. They went to Person's apartment to get something to eat, after which his sister left. He and Person walked around the complex and were

9

approached by two men. He claimed that one of the men called Person "a snitch," as he described in his November interview. Murphy testified that they were then approached by a van with four girls in it from which Person retrieved a phone charger and a bike. He switched the order of these two events in his trial testimony: in November, he recalled Person getting the bike before they were confronted, at trial, he recalled it happening the other way around. And while he recounted the two incidents happening in the same order at trial and during the preliminary examination, in the preliminary examination he said the bike was purple; at trial he claimed it was gray and purple. Murphy never mentioned any of these details at all in his October interview, but because the defendants were not given the transcript of that interview they did not know that.

Murphy told the jury that they then met the girl on their way to the store and walked her home around 7:00 p.m., which largely tracked only his prior statements that the prosecution gave to the defendants (in his preliminary examination testimony he did not mention the trip to the store). But, in contrast, in his October interview he said the girl was still with them when the shooting happened.

Murphy's trial testimony about the shooting also was consistent with the only information available to the defendants, but inconsistent with his October interview. He testified that a group of men began walking behind them before the shooting. Just as Murphy explained in the November interview, he said that Person was pushing a bike at the time. The defendants never knew that in his October interview, Murphy told the police that a *shooter* was on a bike and Person was not. Murphy also told the jury that when the shots were fired he ran "all the way up to maybe the corner of Lippincott and Dort" Highway, or about a half-mile due west of the shooting. The defendants never knew that in Murphy's

10

October interview, he said that he ran into the Evergreen Regency Apartments complex, which is located right at the southwest corner of the intersection where Person was killed.

## 2.  OTHER TRIAL EVIDENCE

The prosecution presented other evidence to support Murphy's story of the shooting. First, it presented shell casings recovered from the scene of the shooting.  These shell casings contained DNA profiles of three unidentified males; none of the defendants' DNA profiles was present.  The police never recovered a gun from the scene.  But the prosecution presented a .380 caliber gun recovered in connection with a different shooting and testimony to connect that gun to one of the defendants, Christian.

Here's how (and bear with us).  About a week after Person was killed, a man named Perry Manuel was driving an SUV with Christian in the passenger seat and two women in the backseat.  They pulled up to another car on the street, and individuals inside that car began shooting at them.  The shooting occurred near a Speedway gas station at the corner of South Center Road and Court Street in Burton, Michigan.  Manuel was shot in the arm; he had a .380 caliber handgun with him that day.  Security footage from the Speedway station showed Christian hiding a gun behind a dumpster.  The police recovered that .380 caliber gun and it was registered to a woman named Yoko Mason-Robertson, who was dating a man named William Harris.

The prosecution gave Harris immunity to testify.  During a police interview, Harris had told police that he gave Mason-Robertson's gun to Joshun Edwards before Person's murder.  The prosecution expected him to say so at trial, but instead he denied it.  He said that he told Sergeant Gaspar that story when she interviewed him because she

11

"basically . . . put me in a position. She basically told me that I either would be a defendant or I would be a witness." He explained that the two of them "just sat there and concocted a story . . . ."

Detective Ronald Ainslie was qualified as an expert witness in firearms analysis and tool marks. Ainslie testified that he had the ability to identify fired cartridge casings and fired bullets and link them to a particular firearm by "looking for . . . markings that are left on a fired cartridge cas[ing] or a fired bullet." These marks would allow him to "identify fired cas[ings] as all being fired from a similar or from the same firearm."

Ainslie examined the casings and fired bullets found at the scene of Person's murder and the gun recovered from the gas station. When testifying about some of these bullets and casings, Detective Ainslie discussed the "lands and grooves" in particular firearms that leave specific marks on fired bullets or spent casings.

When asked to compare the gun recovered from the gas station with "two .380 CBC fired cartridge cas[ings]" recovered from the scene of Person's murder, Ainslie said that the cartridge casings had been fired from the gun hidden at the gas station. But he did not provide any evidence about the specific grooves within the gun or about corresponding marks on the casings that led him to this conclusion. Rather, he simply described the model of the gun found at the gas station—"High Point . . . model CF380"—and said it matched the fired cartridge casings.

Other witnesses testified about seeing either Person or one of the defendants during the day or evening of the shooting. Sinan Asmaro testified that he was working at the Ten Eleven Market the night of the shooting. Person was a frequent customer at the store and Asmaro recalled seeing him there that afternoon, around 3:00 p.m. or 4:00 p.m. But he

12

couldn't remember if Person was alone. He also recalled seeing C'Quan Hinton in the store that day. He had told the police in an interview before trial that Hinton and Person might have spoken to each other, and that Person and another boy were making fun of Hinton, to which Hinton replied, "You better watch your back." But he had no memory of this at trial. Instead, he told the jury that the boys left the store laughing and smiling, explaining that it was "nothing serious" and that "[i]t wasn't words. It was more laughing." He recalled seeing Person come by the store again later. Person had a bike in front of the store, and was speaking with someone Asmaro did not recognize.

Shaquala Watson, who knew Person from school, testified that she also saw him at the Ten Eleven Market that day at about 7:30 p.m. She testified that she saw Person talking to an older man and that he was on a bike as she arrived at the market. When she left the store, she said that Person was by himself. About fifteen minutes later, she heard gunshots.

Xavier Regimbal, who worked for Hi-Tech Security, testified that he was patrolling the Evergreen Regency Apartments the night of the shooting. Around 8:00 p.m., he heard gunshots while in the middle of the apartment complex. By the time he arrived at the corner of Averill and Lippincott, Person was on the ground. He didn't see anyone else at the scene or running away.

Leroy Marks, another Hi-Tech Security employee, was working at the Hi-Tech Security office located at the northwest corner of Averill and Lippincott the night of the shooting. He testified that he heard gunshots around 8:00 p.m. while he was walking in the parking lot. He testified that he saw Person running away from his bike before he was shot, and that he dropped the bike in the parking lot. He stated that he saw no one else

running away that night and that the same boy who dropped his bike and ran was the boy who was shot.

As she told the police the night of the shooting, Ashlie Dye testified that she was driving down Averill when she saw a young boy on a bike, alone. And while the night of the shooting she told the police she did not see the shooters or anyone else in the area, she told the jury that she saw Kino Christian firing a gun with two other men. She also testified that she knew the other defendants but that none of them were the two other men she saw that night. She also revealed that she had previously been in a relationship with Christian and had a personal protection order against him.

Laquashia Blake, C'Quan Hinton's former girlfriend, confirmed the content of a statement she had previously made to the police at trial. In her prior statement, she said, as the prosecution put it, that "[Hinton] told her a few days after the murder that he knows who did the murder, but he wasn't going to snitch" and that "[Christian] did the murder and also got him involved in the situation."

But Blake also testified that Hinton told her that "he didn't do it, and that it was a misunderstanding, that he didn't have anything to do with it," and she agreed that Hinton had told her—as the prosecution phrased it—that the police were trying to get people "to fold," that he was "not going to fold," and that "they can't put me there, or pull my prints off any gun or bullets[.]"

Monica McGee, Kino Christian's friend, testified that the night of the shooting, she heard sirens and called a lot of people from the neighborhood to see what happened, including Christian. She testified that she picked Christian up that night in her car. While she did not recall the exact location of the pick-up, the prosecution reminded her that in a

14

statement to the police, she described picking him up from an apartment complex on Lippincott near Tony's Party Store. With her memory somewhat refreshed she said, "I think I picked him up at those apartments on Lippincott, but I don't know." She testified that they drove to her house in Grand Blanc and watched movies. Although she did not recall at trial, the prosecution reminded her that she had told the police in an earlier interview that while Christian was there, he got a phone call from C'Quan Hinton, who was his nephew. She did not recall what they talked about.

Robert Moore, a jailhouse informant, testified that Christian confessed to the murder while they were locked up together. In exchange for his testimony, the prosecution helped him transfer his probation to another state and may have gotten him an early release (his testimony about the early release was equivocal and was never made clear by the prosecution).

Moore overlapped with Christian in both city and county jail and with Joshun Edwards in county jail. Moore testified that Christian said he was upset with Person because he "was a snitch and he had to be dealt with." He said that Christian said he ran into the girls from the Dodge van at some point on the day of the shooting, who told Christian that they planned to give Person a phone charger and bike. Moore said Christian told him that he and Hinton then confronted Person, and then they went to get guns. Moore said Christian told him that Hinton, Joshun Edwards, and Dartanion Edwards were with him during the shooting and that Person was pushing his bike when they shot him. Each of the details in Moore's account of Christian's detailed jailhouse confession were in police reports; he provided no information that was not in those reports when he was interviewed by the police, something that became the focus of the defense at trial.

15

The defendants maintained their innocence. They argued that Jarylle Murphy was not believable, that they had alibis, and that three other men were responsible for the shooting.

They had material to work with in arguing Murphy was not believable, even without the October interview transcript. Murphy's identifications of the defendants at trial were undermined by his hesitation in his November interview. And by Murphy's own account, he saw the shooters at a distance, for mere seconds, in poor lighting at night. Murphy's credibility was also undermined by the inconsistencies the defendants were aware of between his trial testimony and his earlier statements about the incident. The defendants argued that Murphy was lying because he was a member of a rival gang.

Two of the defendants also presented alibis. Christian testified that he was selling drugs at the time of the shooting out of an apartment on Lippincott and Center Road. Christian's testimony was consistent with Monica McGee's statement to the police that she picked him up from an apartment on Lippincott near Tony's Party Store; Tony's Party Store is about a block from Lippincott and Center. Joshun Edwards testified that he was at the Terrace Apartments off of Atherton Road on the evening of the shooting. He arrived there around 7:30 p.m. and was hanging out with friends in the parking lot.

Christian testified that he told Sergeant Gaspar that William Harris, Perry Manuel, and a man known as "Pooh Bear" were responsible for the shooting. He had been with them at the apartment at Lippincott and Center on the day of the shooting when one of them got a phone call, prompting the three men to grab guns and leave. He recalled Manuel coming back to the apartment later and saying, "Kino, you should have seen [him] fly off the bike."

16

Joshun Edwards testified that William Harris admitted to him that he killed Person with Perry Manuel and Pooh Bear. Recall that Harris was the witness whom the prosecution hoped would connect Christian and Joshun Edwards to his girlfriend's gun. In his testimony, Harris confirmed that he was at the apartment on Lippincott and Center the day of the shooting and that Perry Manuel was there too, just as Christian testified. But he denied killing Person.

Edwards also testified about his relationship to Robert Moore—the jailhouse informant. He explained that Moore told him he knew Edwards and Christian were innocent and that he would come forward with the information if Edwards paid him. He was housed in the same pod as Moore at the county jail and they were cellmates at one point. Because Robert Moore offered to help with his case, Edwards explained, "I let Robert see my paperwork. I wanted to show him how these witnesses were lying on us." He even let Moore keep the police reports overnight.

Perry Manuel died in an unrelated shooting before the trial in this case. And there is no evidence that Pooh Bear was ever identified by the police. Sergeant Gaspar testified that although Williams Harris was once a suspect in the case, the police never tested his DNA. Nor did they test the DNA of the other two men the defendants argued committed this crime, Perry Manuel and Pooh Bear, even though the casings recovered from the scene had three unknown male DNA profiles on them.

17

## D. MOTIONS FOR RELIEF FROM JUDGMENT

Three of the four defendants filed motions for relief from judgment,[1] arguing in part that the suppression of Murphy's October interview transcript violated their right to exculpatory information as required by *Brady v Maryland*, 373 US 83.

The trial court denied all three motions. It found that the transcript of Murphy's October interview had been suppressed by the prosecution and that it was favorable to the defense, but that it was not material. The court reasoned that because the defendants impeached Murphy with the November interview transcript and his testimony from the preliminary examination, "[c]ounsel had considerable opportunity to draw out contradiction by Murphy for the jury's attention" without it. And in the court's view, the summary of the October interview was "substantially similar" to Murphy's statements in the suppressed transcript.

The court was also persuaded that because Murphy was not the only witness to implicate the defendants in the shooting, more impeachment evidence would not have made a difference. Ashlie Dye identified Christian as one of the shooters, and Robert Moore testified that Christian implicated the three other defendants in a jailhouse confession.

The Court of Appeals affirmed. The panel reasoned that while the defendants did not have the transcript of the October interview, they knew it had happened and received a summary. *Edwards*, unpub op at 6. And the defendants were able to "undermine Murphy's

---

[1] Dartanion Edwards did not file a motion for relief from judgment.

18

credibility respecting his identification of them as the shooters" and argue that Murphy "fabricated his testimony" with the evidence they were provided. *Id*. at 6-7.

The panel acknowledged that "discrepancies existed" between the suppressed transcript and Murphy's trial testimony that were "not entirely insignificant." *Id*. at 7. But, in the panel's view, defense counsel were still able to question Murphy "extensively concerning his version of events." *Id*. at 8. For example, they drew out a discrepancy about the color of the bike. In this example, though, the panel inaccurately reported the record: it explained that Murphy said the bike was black at the preliminary examination, contrasting with his trial testimony that it was purple and gray. *Id*. In fact, Murphy testified that the bike was purple at the preliminary examination.

The panel seems to have been convinced that the other evidence in the case made any missing impeachment of Murphy immaterial too. That is, the panel believed that the prosecution "presented direct and circumstantial evidence from which the jury could find each defendant guilty beyond a reasonable doubt" apart from Murphy's testimony. *Id*. at 10.

That testimony, according to the panel, included Moore's testimony about Christian's jailhouse confession, Dye's testimony implicating Christian, and the security camera footage showing Christian disposing of a gun at a gas station after the separate drive-by shooting involving Perry Manuel. *Id*. Although Dye's testimony and the gun found at the gas station were potentially probative of only Christian's guilt, the panel, without explanation, analyzed the evidence as if it applied to all three defendants. And this analysis led the panel to conclude that the suppressed transcript was not material in any of the defendants' cases. *Id*. at 11.

The defendants sought leave to appeal in our Court. We ordered oral argument on the application, asking all three defendants to address whether "the lower courts erred by holding that the suppressed October 16, 2007 interview transcript was not material to their guilt such that they were not entitled to relief under *Brady v Maryland* and *People v Chenault*." *People v Christian*, 507 Mich 952, 952 (2021) (citations omitted).[2]

## II. ANALYSIS

### A. STANDARD OF REVIEW

A trial court's decision on a motion for relief from judgment is reviewed for an abuse of discretion. *People v Washington*, 508 Mich 107, 130 n 9; 972 NW2d 767 (2021). An abuse of discretion occurs when the court makes a decision that "falls outside the range of reasonable and principled outcomes," *id.*, or "makes an error of law," *People v Duncan*, 494 Mich 713, 723; 835 NW2d 399 (2013). A trial court's decision on a *Brady* claim is reviewed de novo. *People v Smith*, 498 Mich 466, 475; 870 NW2d 399 (2015).

### B. MOTION FOR RELIEF FROM JUDGMENT

The defendants filed motions for relief from judgment governed by MCR 6.508 *et seq*. A defendant bringing their first motion for relief from judgment has the burden of demonstrating two things. First, they must show "good cause for failure to raise such grounds on appeal . . . ." MCR 6.508(D)(3)(a). One way to establish good cause is by showing that an external factor prevented appellate counsel from raising an issue on direct appeal. *People v Reed*, 449 Mich 375, 378; 535 NW2d 496 (1995).

---

[2] We also considered C'Quan Hinton's claim that he received ineffective assistance of counsel. Because we conclude that all three defendants are entitled to a new trial under *Brady*, there is no need for us to address Hinton's separate claim in this opinion.

Once a defendant demonstrates good cause, a new trial is only warranted if they also show "actual prejudice from the alleged irregularities that support the claim for relief." MCR 6.508(D)(3)(b). When a defendant is convicted after trial, like the defendants here, "actual prejudice" means that "but for the alleged error, the defendant would have had a reasonably likely chance of acquittal[.]" MCR 6.508(D)(3)(b)(i)(A). Alternatively, a defendant can show actual prejudice where there is an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case[.]" MCR 6.508(D)(3)(b)(iii).

## C. *BRADY v MARYLAND*

The defendants argue in their motions for relief from judgment that the prosecution's failure to provide Murphy's October interview transcripts violated *Brady v Maryland*, 373 US 83. To establish a *Brady* violation, a defendant must show that: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014), citing *Strickler v Greene*, 527 US 263, 281-282; 119 S Ct 1936; 144 L Ed 2d 286 (1999). The parties do not dispute that the transcript was suppressed and is favorable, and the lower courts agreed. The only element of the defendants' *Brady* claim in dispute on appeal is materiality.

To establish that exculpatory evidence is material, a defendant must show that " 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Id*., quoting *Bagley*, 473 US at 682. A "reasonable probability" means " 'a probability sufficient to undermine confidence in

the outcome.' " *Chenault*, 495 Mich at 150, quoting *Bagley*, 473 US at 682 (opinion of

Blackmun, J.). A defendant need not "demonstrat[e] by a preponderance that disclosure of

the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . ."

*Kyles v Whitley*, 514 US 419, 434; 115 S Ct 1555; 131 L Ed 2d 490 (1995). Rather, the

relevant question is whether the defendant "received a fair trial, understood as a trial

resulting in a verdict worthy of confidence." *Id*.[3]

We agree with the United States Supreme Court that the standard for materiality is

"legally simple but factually complex." *Turner*, 582 US at ___; 137 S Ct at 1893. The

Court's applications of this standard are helpful with the complex part.

### 1. *TURNER v UNITED STATES*

First, in *Turner v United States*, the Court showed us how to evaluate the materiality

of suppressed evidence " 'in the context of the entire record . . . .' " *Id*. at ___; 137 S Ct at

1893, quoting *United States v Agurs*, 427 US 97, 112; 96 S Ct 2392; 49 L Ed 2d 342 (1976).

---

[3] Hinton argues that this Court should follow other jurisdictions and adopt a materiality standard that is easier for a defendant to meet than the standard mandated under the federal Constitution. See, e.g., *State v Laurie*, 139 NH 325, 330; 653 A2d 549 (1995) (under the New Hampshire constitution the prosecution bears the burden to prove beyond a reasonable doubt that undisclosed evidence would not have affected the verdict); *People v Fuentes*, 12 NY3d 259, 263; 907 NE2d 286 (2009) (applying the "reasonable probability" standard to a *Brady* violation in certain circumstances). This Court has never addressed under what circumstances withheld evidence requires granting a defendant a new trial under the Michigan Constitution. Cf. *Chenault*, 495 Mich at 155 (addressing the appropriate standard under the federal Constitution as provided in *Brady*). Because we conclude that the defendants are entitled to relief under the *Brady* standard—which provides a constitutional floor for the circumstances under which relief must be granted for withheld exculpatory evidence—we need not decide whether the Michigan Constitution requires a different materiality standard.

The *Turner* defendants were convicted of robbing and assaulting a woman in a parking garage. *Turner*, ___ US at ___; 137 S Ct at 1889. The prosecution's theory was that the victim had been attacked by a large group. *Id*. The prosecution's evidence centered on the testimony of two witnesses—Calvin Alston and Harry Bennett—who confessed to participating in the attack and testified in exchange for leniency. *Id*. While their accounts differed on small details, both said that a large group of people (including them) had attacked the victim.

The defendants argued that suppressed evidence would have allowed them to advance an alternative theory that the victim had been attacked by a single perpetrator. *Id*. at ___; 137 S Ct at 1893. First, suppressed notes from a police interview with a man named Willie Luchie revealed that Luchie had walked by the garage the night of the attack and heard groans. *Id*. at ___; 137 S Ct at 1891-1892. Second, the man who discovered the victim in the garage testified that two men had stopped in the garage for about five minutes while he was waiting for the police to arrive. The police suppressed the identity of these two men, and one of them was later arrested for robbing and assaulting other women in the neighborhood. *Id*. at ___; 137 S Ct at 1891.

The defendants' view was that had they known about this suppressed evidence, they could have argued to the jury that the crime was committed by a single perpetrator—the man later arrested for a different crime—not a group. The Court held that the suppressed evidence was not material, because it was "too little, too weak, or too distant from the main evidentiary points . . . ." *Id*. at ___; 137 S Ct at 1894. While the prosecution's central witnesses, Alston and Bennett, were not completely consistent about every detail, "virtually every witness to the crime itself agreed as to a main theme: that [the victim] was

23

killed by a large group of perpetrators." *Id*. The suppressed evidence did not undermine the central evidence that established the prosecution's theory of guilt such that it created a reasonable probability of a different result.

## 2. *WEARRY v CAIN*

In contrast, the United States Supreme Court found that suppressed evidence was material in *Wearry v Cain*, 577 US 385; 136 S Ct 1002; 194 L Ed 2d 78 (2016). In that case, a man named Sam Scott contacted the police while incarcerated and implicated the defendant in a brutal murder that occurred two years earlier. *Id*. at 386. Scott's original account did not match the physical evidence of the crime, and his story changed substantially over time to become more consistent with the other evidence. *Id*. at 387. Still, he was the prosecution's "star witness" at trial. *Id*. Another prosecution witness—Eric Brown—testified, consistently with Scott's account, that he saw the defendant with a man who looked like the victim that night.

The defendant presented an alibi defense—his relatives testified that he was at a wedding about 40 miles from the crime when it occurred. *Id*. at 388. The Court characterized the prosecution's trial evidence as "a house of cards" that required the jury to credit Scott's testimony rather than the defendant's alibi. *Id*. at 392.

The prosecution suppressed impeachment evidence that undermined Scott's credibility further and evidence that Brown had sought a deal to reduce his sentence in exchange for testifying. *Id*. at 390. In concluding the evidence was material, the Court reasoned that "the only evidence *directly* tying" the defendant to the murder "was Scott's dubious testimony, corroborated by the similarly suspect testimony of Brown." *Id*. at 393

(emphasis added). While Scott's credibility was challenged at trial, the Court reasoned that it "would have been further diminished had the jury learned" about the added impeachment evidence. *Id*. And, Brown's testimony—if believed—helped corroborate Scott's testimony. The evidence that Brown had a motive to lie would have undermined the confidence not only in his testimony, but in Scott's too. *Id*. at 394.

### 3. *KYLES v WHITLEY*

Finally, *Kyles v Whitley*, 514 US 419, is also important. The defendant was convicted of the murder of Dolores Dye, who was shot in the head while putting grocery bags in her car. *Id*. at 423. The man who shot her took her keys and drove away. Two days later, a man named Beanie called the police station and reported that he had bought a car matching the description of the stolen car from the defendant. *Id*. at 424. Beanie claimed he came forward to the police because he feared the defendant had stolen the car. But Beanie's story changed over time and grew inconsistent with the details of the crime known to the police. And yet, "[t]he police neither noted the inconsistencies nor questioned [him] about them." *Id*. at 427.

The prosecution withheld recordings of the conversations between the police and Beanie in which his story changed. *Id*. at 428. The Court found that the suppressed evidence was material in part because it "would have raised opportunities to attack . . . the thoroughness and even the good faith of the investigation . . . ." *Id*. at 445. Beanie's statements to the police "were replete with inconsistencies and would have allowed the jury to infer that Beanie was anxious to see [the defendant] arrested" for the murder. *Id*. The statements would have "revealed a remarkably uncritical attitude on the part of the

25

police." *Id*. *Kyles* shows that determining whether defendants received "a trial resulting in a verdict worth of confidence" requires an analysis not just of the evidence presented, but of the quality of the investigation.

### D. THE DEFENDANTS HAVE DEMONSTRATED GOOD CAUSE

The prosecution does not dispute that the defendants have demonstrated good cause. While neither the trial court nor the Court of Appeals addressed the issue of good cause, both concluded that the prosecution suppressed the transcript. That suppression was an "external factor" that preventing appellate counsel from raising a *Brady* violation on direct appeal. *Reed*, 449 Mich at 378.

### E. THE DEFENDANTS HAVE DEMONSTRATED ACTUAL PREJUDICE BECAUSE THE OCTOBER TRANSCRIPT WAS MATERIAL

The transcript of Murphy's October interview was material for three reasons. First, it would have provided far more substantial impeachment evidence than any of the evidence the defendants were provided. Second, it would have undermined the other prosecution evidence and supported the defendants' theory of defense. And third, the suppression of the transcript calls the thoroughness and good faith of the investigation into question.

To prevail at trial, the defendants needed the jury to believe that Jarylle Murphy was not telling the truth. The transcript of his October interview would have provided far more support for their strategy than the evidence that was known to defendants at the time of trial. The transcript differed from Murphy's trial testimony and from his prior statements that the defendants were provided—the November interview and preliminary examination testimony—in eight important ways. These inconsistencies are more compelling because

it was the first statement he gave to the police, and the one closest in time to the crime. And even worse, the summary of the October interview that was provided instead of the transcript left out or changed the important inconsistencies.

First, the time line of events on the day of the shooting. The suppressed transcript reveals that Murphy told Sergeant Gaspar that he boarded a bus to South Flint at 6:30 p.m. and that the shooting took place around 9:00 p.m. or 9:30 p.m. Testimony of other witnesses, including Xavier Regimbal, the security guard patrolling the Evergreen Regency Apartments that night, made clear that the shooting happened around 8:00 p.m., as Murphy himself would later say in his November interview and preliminary examination testimony. The jury never learned about this change in Murphy's story because the summary changed the detail; it says he reported that the shooting took place at 8:00 p.m.

Besides the changed story, Murphy's statement that he did not board the bus to South Flint with his sister until 6:30 p.m. in his original interview would have made it virtually impossible for him to be present at the shooting by 8:00 p.m. He would have had to ride the bus across town, visit with his sister's uncle, walk 1.9 miles, meet Person for the first time, have the initial confrontation with the two shooters, and meet the girl—all in an hour and a half. Because Murphy never again mentioned boarding the bus at 6:30 p.m.—and that detail did not appear in the summary of the October interview—the defendants could not question Murphy on how he would have been able to be present at the crime scene when it happened.

Second, motive. The suppressed transcript reveals that Murphy said that one of the men accused Person of snitching on his mom—unlike his later accounts, where he says one of the men accused Person of snitching on his brother. The jury never knew about this

27

inconsistency either, as the summary falsely changed this detail to make it consistent with Murphy's revised story.

Third, the van. The suppressed transcript reveals that Murphy never mentioned Person getting a phone charger and bike from a Dodge van during the October interview. Those details first emerged in his November interview and remained consistent moving forward. But because the defendants only had the summary, the jury never found out that Murphy never mentioned the van in his original interview.

Fourth, the girl. The suppressed transcript reveals that Murphy claimed that the girl was still with him and Person when the shooting happened, unlike his later statement and trial testimony that the girl had left before Person was killed. The jury never learned about this change in Murphy's story either because the summary omits this detail too.

Fifth, the bike and who rode it. The suppressed transcript reveals that in October Murphy was adamant that one of the shooters, and not Person, was on a bike; and he sticks to this story even when asked multiple times. By his November interview, Murphy said that Person was on a bicycle at the time of the shooting, and this is what Murphy told the jury as well. But the jury never learned that Murphy's story changed in this important way because the misleading summary omitted this inconsistency too.

Sixth, the location of the shooting. The suppressed transcript reveals that Murphy claimed he and Person were sitting down when the shooters approached. By his November interview he said they were walking at the time, and he told the jury that as well. The jury never knew about this change of story either; it too was omitted from the summary.

Seventh, Murphy's ability to see. The suppressed transcript reveals that Murphy did not express confidence in his ability to see the shooters because it was "kinda dark." He told the jury, however, that he was confident that the defendants shot Person. The

28

defendants challenged Murphy's ability to identify the shooters given the time of night and the fact that the shooters approached from behind. But their challenge would have been more convincing if they had known that when Murphy first spoke to Sergeant Gaspar he told her he was not confident he could identify the assailants. The jury never learned that fact because the inaccurate summary omitted it.

And eighth, where Murphy fled after the shooting. The suppressed transcript reveals that Murphy claimed that as shots were fired he ran into the middle of the Evergreen Regency complex, which is at the intersection where Person was killed. But he told the jury that he ran about a mile due west of the shooting, just as he had at the preliminary examination. The jury never learned about this story change either—it, too, was omitted from the summary.

Each inconsistency is significant, but the sum of them is striking.

| | Suppressed October Transcript | Summary of October Interview | November Interview | Preliminary Examination Testimony | Trial Testimony |
|---|---|---|---|---|---|
| **Time of shooting** | 9:00 p.m. or 9:30 p.m. | 8:00 p.m. | 8:00 p.m. | 8:00 p.m. | Not discussed |
| **Motive for the shooting** | Snitching on "moms" | Snitching on "brother" | Snitching on "brother" | Snitching on "brother" | Snitching |
| **Whether Person obtained a phone charger and bicycle from four girls in a van** | No | *Not Mentioned in Summary* | Yes | Yes | Yes |
| **Whether the girl was still with Murphy and Person during the shooting** | Yes | *Not Mentioned in Summary* | No | No | No |
| **Who had a bicycle during the shooting** | One of the shooters | *Not Mentioned in Summary* | Person | Person | Person |
| **Where Person and Murphy were located during the shooting** | Sitting on the sidewalk | *Not Mentioned in Summary* | Walking | Walking | Walking |
| **How well Murphy could see the shooters** | Not well because it was "kinda dark" | *Not Mentioned in Summary* | Not well because all he could do was "take a glance" | He could see the shooters well | He could see the shooters well |
| **Where Murphy ran after the shooting** | Into the Evergreen Regency Apartments | *Not Mentioned in Summary* | Not discussed | Up Lippincott toward Crocker (due west) | Up Lippincott toward Dort Hwy (due west) |

Murphy's testimony was central to the prosecution's case, and the suppressed transcript would have significantly undermined it. The jury never knew the extent to which Murphy's story changed from his first interview. The transcript of that interview was not "too little, too weak, or too distant from the main evidentiary points . . . ." *Turner*, 582 US at ___; 137 S Ct at 1894. Quite the opposite.

The Court of Appeals acknowledged some of these inconsistences, although incorrectly in part, but was not persuaded the additional impeachment evidence mattered. It is true that the defendants were able to highlight some inconsistencies between the versions of Murphy's story they were aware of, but the inconsistencies that could have been emphasized with the October interview are more significant. That the defendants argued to the jury that there were reasons to doubt Murphy's story does not make *more* evidence that he was lying immaterial. To the contrary, it makes the possibility that the result of the trial would have been different *more* likely.

The Court of Appeals made a second error in its consideration of the other evidence presented. The panel concluded that the transcript was also not material because "the prosecution presented direct and circumstantial evidence from which the jury could find each defendant guilty beyond a reasonable doubt of the charged offenses *independent* of Murphy's testimony." *Edwards*, unpub op at 10 (emphasis added). Put another way, because there was sufficient evidence notwithstanding Murphy's testimony, even if the transcript led the jury to discredit him completely, the panel concluded that there was not a reasonable probability that the result of the proceeding would have been different.

30

But this reasoning misses the quality of the other evidence, and Murphy's centrality to it. That other evidence "would have been further diminished had the jury learned" about the suppressed evidence. *Wearry*, 577 US at 393.

Beyond Murphy's testimony, the prosecution's evidence included: (1) the .380 caliber casings and the .380 caliber gun hidden by Christian at the gas station, (2) Ashlie Dye's testimony implicating Christian, (3) Laquashia Blake's testimony about Christian and Hinton's possible involvement, and (4) Robert Moore's testimony about a jailhouse confession by Christian implicating the other defendants. Without Murphy's testimony to organize and tie together the remaining fractured stories, the sum of this other evidence loses much of its value.

If Murphy was discredited, the fact that Christian was found with a .380 caliber gun after his involvement in an unrelated shooting becomes less relevant. Without Murphy implicating Christian as one of the shooters, then Christian likely hid the gun because of its connection with the drive-by shooting we *know* it was connected to. And without Murphy's testimony connecting Christian to the shooting, that gun implicates Perry Manuel and William Harris at least as much as Christian; it was registered to Harris's girlfriend and used in connection with the 2007 shooting of Manuel. Manuel and Harris, of course, are two of the three men the defendants argued were responsible for this crime.

Detective Ronald Ainslie's expert testimony would also lose its relevance in connecting Christian to the murder without Murphy's testimony. Detective Ainslie testified that the spent .380 caliber casings recovered from the scene of Person's murder had been fired from the gun found at the gas station. But his opinion was based not on a unique attribute of the recovered casings or on the particular gun found, but on generic

31

characteristics of that model of gun. That is, a .380 caliber was fired by Person's assailants, and while Ainslie told the jury the casings were from the particular .380 caliber recovered, he apparently did not identify any "lands" or "grooves" or other specific markings that supported his conclusion.

Put differently, while he told the jury about how a ballistics expert can tie a particular bullet or casing to a particular firearm, and that some of the bullets recovered from the crime scene had markings that would allow such a connection to be made, he offered no information about the particular casings he said came from the gas station gun.

If the jury didn't believe Murphy, it would have had more reason to doubt Ashlie Dye too. Dye, who told the police the night of the shooting that she did not see the shooters, identified Christian as one of them a year later. The jury learned about this inconsistency, and about Dye's possible motive to implicate Christian, but Murphy's identification of Christian as one of the shooters bolstered Dye's.

If the jury didn't believe Murphy, the value of Blake's testimony would also diminish. Blake told the police before trial that Hinton had told her that Christian committed the murder and "got him involved." But at trial, she testified that Hinton told her unequivocally that "he didn't do it." Murphy's testimony bolstering her first statement made this impeachment evidence more believable. Blake also testified that Hinton told her, "[T]hey can't put me there or pull my prints off any gun or bullets." Without Murphy's testimony identifying Hinton as one of the shooters, this statement would have been consistent with Hinton claiming that he was falsely accused of this crime.

And if the jury did not believe Murphy, Robert Moore's account of Christian's alleged confession would likely also not be believed. Moore claimed that Christian

confessed to committing the shooting exactly as Murphy described it happening in his November interview, and as recorded in the police reports Moore had access to before he came forward. That coincidence would have been far more salient if the jury disbelieved Murphy. And since neither the gun found at the gas station nor Ashlie Dye implicated Hinton or Edwards, if the jury did not believe Murphy, Moore's testimony would have been the only evidence linking Edwards to the crime. Similarly, only Moore's and Blake's testimony would have linked Hinton to the crime.

Finally, exculpatory evidence is material if it calls into question "the thoroughness and even the good faith of the investigation . . . ." *Kyles*, 514 US at 445. The transcript of the October interview surely does. When Murphy came into the police station for his first interview, the police knew that a good friend of Person, Anthony Williams, told the police the day after the shooting that he had spent the afternoon and evening hanging out with Person until moments before the shooting. Williams did not mention Jarylle Murphy. And Murphy never mentioned Williams. Murphy's story contradicted Williams's, and yet the police never asked Murphy about Williams. And neither the police nor the prosecution ever contacted Williams again, despite his willingness to testify. Murphy's story also contradicted both Ashlie Dye's and Williams's accounts that Person was alone when he was shot. Murphy's story also contradicted Leroy Marks's testimony at trial that after hearing gunshots, he saw one boy running away from his bike before getting shot with no one else around. Yet the police "neither noted the inconsistencies nor questioned" Murphy about them. *Id*. at 427.

Murphy arrived at the police station with a detailed written description of the four shooters down to the color and brand of their shoes and the guns they carried, and yet told

the police that he could not get a good look at them because it was "kinda dark," they were approached from behind, and the interaction happened in a matter of seconds. But the police failed to question Murphy about how he generated such a detailed description of the four men.

Murphy's version of events also was inconsistent with the physical evidence. In the suppressed interview, he had the time of the shooting wrong, said Person had been sitting on the sidewalk at the time of the shooting, claimed that Person did not have a bike, that one of the shooters was on a bike, and that a girl was with them. But the bike was discovered right by Person's body, suggesting he had been riding or walking it at the time he was shot, not sitting on a sidewalk, and the police did not locate a girl who had been with Person during the shooting. Finally, none of the defendants' DNA matched the DNA recovered from the .380 caliber casings found at the scene—three other DNA profiles were identified on those casings.

Despite all these problems with Murphy's story, the prosecution built its case around it—and kept the most significant problems with his story from the defendants by providing them with a false and incomplete summary of his first interview instead of the transcript. The investigation reveals an "uncritical attitude" on the part of the police, *Kyles*, 514 US at 445, and the suppressed transcript "would have raised opportunities to attack . . . the thoroughness and even the good faith of the investigation," *id*.

Because we conclude the transcript is material, the defendants easily meet the standard for actual prejudice under MCR 6.508. Evidence is material if there is a " 'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Chenault*, 495 Mich at 150, quoting *Bagley*,

34

473 US at 682. The standard for actual prejudice is strikingly similar; a defendant can show it where "but for the alleged error, the defendant would have had a reasonably likely chance of acquittal[.]" MCR 6.508(D)(3)(b)(i)(A).

Given the centrality of Murphy's testimony and the strength of the suppressed impeachment evidence, we conclude that if the defendants had had access to the transcript, they would have had both a "reasonable probability" of a different result and at least a "reasonably likely chance of acquittal." *Chenault*, 495 Mich at 150; MCR 6.508(D)(3)(b)(i)(A).

## III. CONCLUSION

The transcript is material because the defendants have demonstrated a reasonable probability that had it been disclosed, the result of the trial would have been different. It would have been powerful impeachment evidence of Murphy, the prosecution's central witness, making the defendants' argument that he was fabricating his story more likely. And if the jury did not believe Murphy, the other evidence would also be less believable. The state's suppression of the transcript calls the thoroughness and good faith of this investigation into question.

Because the transcript is material, the defendants were prejudiced by its suppression. But for the *Brady* violation, "the defendant[s] would have had a reasonably likely chance of acquittal[.]" MCR 6.508(D)(3)(b)(i)(A). Having established both good cause and actual prejudice, the defendants are entitled to a new trial.

Bridget M. McCormack
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch

35

# STATE OF MICHIGAN

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                      No. 162354

KINO DOMINIQUE CHRISTIAN,

      Defendant-Appellant.

_____

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                      No. 162355

JOSHUN EDWARDS,

      Defendant-Appellant.

_____

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                      No. 162374

C'QUAN MICHAEL HINTON,

      Defendant-Appellant.

_____

CLEMENT, J. (*dissenting*).

I respectfully disagree with the majority's decision to award new trials to defendants. While I agree with the majority that the prosecution's failure to provide defendants with the transcript of witness Jarylle Murphy's first interview with law enforcement constituted suppression of favorable evidence under *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), I disagree that this evidence fulfills *Brady*'s materiality requirement such that defendants are entitled to a new trial. Accordingly, I would deny defendants Kino Christian's and Joshun Edwards's applications for leave to appeal, and I would remand defendant C'Quan Hinton's case to the trial court for an evidentiary hearing on his ineffective-assistance-of-counsel claim.

## I. FACTUAL BACKGROUND AND TRIAL

These cases arise from the fatal shooting of 14-year-old Robert Person on October 9, 2007, for which the prosecutor charged Christian, Joshun Edwards, Hinton, and Dartanion Edwards[1] with first-degree premeditated murder, assault with intent to murder, carrying a concealed weapon, and possession of a firearm during the commission of a felony.[2] Among the evidence introduced against defendants at trial was the testimony of Jarylle Murphy, who spent the hours preceding the murder with Person and witnessed the shooting. Because defendants argue that Murphy's testimony has been significantly

---

[1] Dartanion Edwards was found guilty and sentenced to life in prison. Because he is not a party to this appeal, references to "Edwards" hereinafter are to Joshun Edwards, and "defendants" will refer only to Edwards, Hinton, and Christian.

[2] The prosecutor also charged both Christian and Edwards with being a felon in possession of a firearm.

undermined by the posttrial discovery of evidence withheld by the prosecution, a detailed review of both Murphy's testimony and the other evidence presented at trial is necessary.

According to Murphy's trial testimony, after basketball practice at a community center, he ran into his sister at a nearby bus stop and decided to accompany her to visit her uncle at Howard Estates. He estimated that they arrived at the uncle's home "probably around 4:30ish" and stayed for 30 to 45 minutes before walking to the Evergreen Regency Apartments, where Murphy's sister planned to meet some friends. Upon their arrival, Murphy's sister introduced him to Person, and the trio eventually went to Person's house for food. After "[m]aybe ten to 15 minutes at the most," Murphy's sister left. Murphy and Person thereafter walked around the apartment complex, where they were then approached by two individuals. According to Murphy, one of the individuals "asked [him] why was [he] with [Person] because [Person] was a snitch" and verbally confronted Person, "[b]asically telling him that they were going to get him and he was a snitch." At trial, Murphy identified the two individuals as defendants Christian and Hinton.

Murphy testified that after the confrontation, he and Person went to the store. En route, they were joined by a girl with whom Murphy was unfamiliar. They also came into contact with multiple people riding in a van, from whom Person retrieved an item— possibly a phone charger—and a bicycle before they departed. Murphy described the bicycle as "a mountain bike, gray and [he] believe[d] purple."

Murphy testified that later that evening—"after 7," as the sky "was in transition" between light and dark and "towards nighttime"—he and Person walked the unknown girl to another apartment complex. They spoke briefly, "for maybe five more minutes," at the front of the apartment complex before walking back toward the Evergreen Regency

3

Apartments. As they approached the intersection of Lippincott Boulevard and Averill Avenue, Murphy noticed four men following them. He asked whether Person noticed them, and Person said no. Murphy looked back again, and "that's when [he saw] them, you know, pulling out the guns . . . ." Murphy alerted Person and fled. According to Murphy, he "made it to around maybe about the corner" when he heard gunshots. Afterward, Murphy returned to the Evergreen Regency Apartments. He learned that Person had not survived the shooting when he saw the news on television later that evening.

According to Murphy, his grandparents eventually convinced him to disclose his involvement in the shooting to law enforcement, and he was voluntarily interviewed by law enforcement on October 16, 2007, one week after the shooting. Before the interview, Murphy expressed in writing detailed information about the shooters and their firearms based on his observations.[3] He would later testify at trial that, when the shooters were pursuing him and Person, the shooters were near and then underneath a streetlight and at a

---

[3] At trial, Murphy read the following descriptions from his written statement regarding the shooters:

> Suspect number one, Jobos [sic: Girbauds], orange stripes, orange, white, navy blue hightop Forces, orange, white tee shirt, and a hoody. Suspect number two, blue jean pants, white tee shirt, all white Forces, black hoody. Suspect number three, gray Dickey's, black shirt, black Jordan's, do rag, and black and gray hat. Suspect number four, Jobos [sic], red stripes, black and red shirt, black and red Jordan's, black coat. Suspect number one, about 6'3" or 6'4", dark skin, peach fuzz, small mustache, brown eyes, short black wavy hair. Suspect number two, about 5'9" or 5'10", light or brown skin, short nappy hair, peach fuzz, light mustache, light brown eyes. Suspect number three, about 5'11" or 6', dark skin, black hair, long braids, goatee, sideburns, both ears were pierced. Suspect number four, about 5'6", brown skin, brown eyes, short even cut hair, stocky build.

4

distance of "somewhere around" 35 to 50 feet away.[4]  According to Murphy, the light, the distance, and his photographic memory allowed him to perceive and recall these details despite the short amount of time he viewed the shooters.  From this information, Murphy was able to identify defendant Hinton from a photographic lineup during his October 16, 2007 interview and the remaining defendants during his November 8, 2007 interview.

At trial, each defendant's counsel thoroughly cross-examined Murphy about this narrative, including specific challenges to his identification of defendants as the shooters.  After Murphy acknowledged having seen the shooters for only about five seconds, the cross-examiners pressed him on the details of his observations and thoroughly impeached his assertion that he had a photographic memory.  Specifically, upon questioning, Murphy was unable to recall what clothing defendants Hinton and Christian were wearing when they initially confronted Person on the day of the shooting, and he was also unable to recall Hinton's and his defense counsel's clothing or facial hair from the previous day of trial.  (In return, Murphy explained that his photographic memory encompasses only what he focuses on, and that colors and sometimes scenery are difficult to recall.)  Further, Murphy struggled to match each defendant to the shooter descriptions he created before the October 16, 2007 interview.  Finally, the defense also emphasized that Murphy's descriptions of the shooters came one week after the shooting, as Murphy fled the scene and did not give a statement to law enforcement on the evening of the shooting.

---

[4] At trial, Murphy related the distance in terms of the courtroom, and counsel and the trial court estimated that distance to be 45 to 50 feet.  At the preliminary examination, Murphy testified that the distance was 35 yards, but at trial he testified that he had meant feet, not yards.

5

Defendants also challenged Murphy's testimony on the basis of inconsistencies between his trial testimony and earlier statements. The defense had in its possession a summary of Murphy's October 16, 2007 interview with law enforcement, a transcript of Murphy's November 8, 2007 interview with law enforcement, and the transcripts of Murphy's preliminary-examination testimony. The defense demonstrated that, at the preliminary examination, Murphy had testified that Person's bicycle was purple, not purple and gray; they also elicited testimony from Murphy that he recalled the additional color at trial only after viewing the photograph of the bicycle admitted into evidence. The defense emphasized that Murphy had also previously testified that the shooters were, at closest, 35 yards away. When Murphy testified that he had meant "feet" rather than "yards," the defense elicited testimony regarding Murphy's football experience and argued that it was unbelievable for him to have mixed up the two units of length given that experience. Murphy had also previously testified at the preliminary examination that he saw two police vehicles as he fled from the shooting, in direct contrast to his testimony at trial that he heard sirens but did not see any police vehicles as he fled.[5]

In addition to Murphy's testimony, the prosecution introduced several other pieces of inculpatory evidence. Ashlie Dye, defendant Christian's former girlfriend, testified that she was driving in the area during the shooting and that a bullet hit her vehicle. Dye

---

[5] The defense also noted that Murphy had testified repeatedly at the preliminary examination that he and Person did not go into the store; at trial, Murphy testified that he and Person went to the store before walking the unknown girl to her home. However, as the prosecution noted on redirect, Murphy's preliminary-examination testimony was given in the context of questions regarding what occurred once Person and Murphy realized they were being followed by the four individuals. Murphy did not testify at the preliminary examination that he and Person never went to the store on the evening in question.

6

identified Christian as one of the shooters, and testified that he had apologized to her for her vehicle being shot. Robert Moore, a cellmate of Christian and defendant Edwards, testified that Christian admitted to murdering Person and that both defendants solicited Moore to murder Murphy on multiple occasions. Laquashia Blake, defendant Hinton's former girlfriend, testified that Hinton told her that "his Uncle Kino [Christian] did the murder and also got him involved in the situation." Monica McGee also testified that, on the night of the shooting, Hinton appeared nervous and later spoke to Christian on the phone regarding the media coverage of the shooting.

The prosecution also presented evidence regarding law enforcement's recovery of one of the firearms involved in the shooting. The firearm belonged to the girlfriend of William Harris, an acquaintance of defendants'. Although he later rejected this narrative at trial, Harris initially told the police that he had obtained the firearm from his girlfriend and gave it to Christian for the express purpose of murdering Person. Harris also averred that Christian bragged to him about being responsible for Person's murder. The firearm was recovered because of its involvement in a shooting a few days after Person's murder. During that shooting, Christian was a passenger in one of the two vehicles whose passengers shot at one another. Surveillance camera footage showed Christian hiding the firearm behind a gas station after the shooting. Detective Sergeant Ronald Ainslie of the Michigan State Police Department later matched four fired cartridges from the scene of Person's shooting to this firearm.

Defendants, for their part, maintained their innocence. In addition to challenging the credibility of the various witnesses against them, defendants also presented the testimony of various witnesses who observed Person walking alone on the day of the

7

shooting. Defendants Christian and Edwards also pursued alibi defenses. Christian testified that, at the time of the shooting, he had been selling drugs in an apartment; Edwards testified that, at the time of the shooting, he had been hanging out with friends in an apartment parking lot. Both defendants also posited that the persons responsible for Person's murder were actually Harris; a man known as "Pooh Bear"; and Perry Manuel, who had been involved in the October 13 shooting with Christian. Christian testified that the three men had been present with him at an apartment on the day of the shooting and, after receiving a phone call, had retrieved guns and left the apartment abruptly; upon their return, Manuel bragged about murdering Person. Defendants also emphasized that law enforcement did not identify "Pooh Bear" and never tested the DNA of these suspects against the DNA recovered from the scene.

At the close of trial, the jury found defendants guilty as charged. Defendants were unsuccessful on direct appeal. *People v Christian*, unpublished opinion per curiam of the Court of Appeals, issued September 22, 2011 (Docket Nos. 291578, 291687, and 291744), lv den 492 Mich 864 (2012) and 492 Mich 865 (2012).

## II. MOTIONS FOR RELIEF FROM JUDGMENT AND PROCEDURAL HISTORY

Years after defendants' convictions, a relative of defendant Edwards requested and received documents related to his case from the Flint Police Department pursuant to Michigan's Freedom of Information Act, MCL 15.231 *et seq*. The documents revealed that a full transcript of Murphy's first interview with law enforcement on October 16, 2007, had been withheld from defendants. Instead, the defense had received a summary of the

8

interview created by law enforcement—a summary defendants argue was incomplete and inaccurate.

Defendants moved for relief from judgment on the basis of the undisclosed transcript. They argued that the transcript contained favorable evidence insofar as it established inconsistencies in Murphy's statements that could have been used to impeach his testimony at trial and that its suppression therefore violated their constitutional due-process rights as established in *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963). Specifically, defendants identified the following differences with Murphy's statements during the October 16, 2007 interview: the timing of the initial bus ride with his sister (at trial, sometime before their arrival at the uncle's home "around 4:30ish" and at the interview, "6:30"), the timing of the shooting (at the preliminary examination, "around 8:00", which was consistent with other testimony and the 911 call, and at the interview, around 9:00 or 9:30), the details regarding Person's encounter with defendants Christian and Hinton before the shooting (at the November 8, 2007 interview and preliminary examination, Christian and Hinton accused Person of snitching on a little brother, and at the interview, of snitching on a mother), whether the unknown girl was present during the shooting (at trial, she was not, and in the interview, she was), whether Person was on a bicycle at the time of the shooting (at trial, he was, and in the interview, he was not), and where Person and Murphy were at the time of the shooting (at trial, they were walking, and at the interview, they were sitting talking to the unfamiliar girl).

The trial court—which presided over defendants' entire trial, sentencing, and resentencing—ultimately denied defendants' motions for relief from judgment, concluding that although the prosecution had failed to disclose favorable evidence to defendants before

9

trial, the favorable evidence was not material and, therefore, reversal was not required. In so doing, the trial court reasoned that the inconsistencies between the October 16, 2007 transcript and Murphy's later statements were "minor at best" and that the defense had thoroughly cross-examined Murphy despite lacking the October 16, 2007 interview transcript. On appeal, the Court of Appeals agreed, emphasizing the inculpatory evidence presented at trial that was independent of Murphy's testimony.

Defendants subsequently applied for leave to appeal in this Court, and we issued an order to schedule oral argument on the applications and directing the parties to address "whether the lower courts erred by holding that the suppressed October 16, 2007 interview transcript was not material to their guilt such that they were not entitled to relief under *Brady v Maryland*, 373 US 83, 87 (1963), and *People v Chenault*, 495 Mich 142, 149-150, 155 [845 NW2d 731] (2014)." *People v Christian*, 507 Mich 952, 952 (2021).

III. *BRADY* ANALYSIS

In order to succeed on a *Brady* claim, a defendant must prove that "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *Chenault*, 495 Mich at 150. Whether the prosecution's suppression occurred in bad faith is irrelevant to the inquiry. *United States v Agurs*, 427 US 97, 110 & n 17; 96 S Ct 2392; 49 L Ed 2d 342 (1976). Notably, the prosecution's duty to disclose favorable evidence includes all favorable evidence held by other government actors, including law enforcement. *Kyles v Whitley*, 514 US 419, 437; 115 S Ct 1555; 131 L Ed 2d 490 (1995); *People v Dimambro*, 318 Mich App 204, 213; 897 NW2d 233 (2016). Further, both substantive exculpatory evidence and impeachment evidence are considered favorable

10

evidence for purposes of the *Brady* inquiry. *Turner v United States*, 582 US ___, ___; 137 S Ct 1885, 1893; 198 L Ed 2d 443 (2017).

I agree with the majority that the first two prongs of the *Brady* inquiry are met here. The prosecution failed to turn over the October 16, 2007 transcript of Murphy's first interview with law enforcement to defense counsel before trial, and that transcript contained favorable evidence insofar as it contained inconsistencies with Murphy's other statements. However, I disagree with the majority regarding the materiality of the October 16, 2007 interview transcript. In order to demonstrate that a piece of evidence is material, a defendant must

> show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v Bagley*, 473 US 667, 682; 105 [S Ct] 3375; 87 L Ed 2d 481 (1985). This standard "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . ." *Kyles*, 514 US at 434. The question is whether, in the absence of the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. In assessing the materiality of the evidence, courts are to consider the suppressed evidence collectively, rather than piecemeal. [*Chenault*, 495 Mich at 150-151.]

Further, while impeachment evidence can be material under *Brady*, see *Wearry v Cain*, 577 US 385; 136 S Ct 1002; 194 L Ed 2d 78 (2016), its materiality in any particular case is dependent on the extent of the impeachment and the strength of the other evidence presented, see *Agurs*, 427 US at 112-113; *Smith v Cain*, 565 US 73, 76; 132 S Ct 627; 181 L Ed 2d 571 (2012). See also *People v Salazar*, 35 Cal 4th 1031, 1050; 112 P3d 14 (2005) ("In general, impeachment evidence has been found to be material where the witness at issue supplied the only evidence linking the defendant(s) to the crime, or where the likely

11

impact on the witness's credibility would have undermined a critical element of the prosecution's case.") (quotation marks and citations omitted).

I believe that the impeachment evidence contained in the October 16, 2007 interview transcript is not material under *Brady* because its impeachment value is limited and because other inculpatory evidence admitted at trial corroborated defendants' guilt. Defendants identify several inconsistencies between the October 16, 2007 transcript and Murphy's other statements, but many do not present new avenues for impeachment. For example, the October 16, 2007 transcript indicates that Murphy had previously been less certain about his identification of defendants than his trial testimony would suggest." But defendants were aware of Murphy's uncertainty. In the November 8, 2007 interview transcript, Murphy stated that he "couldn't see [the shooters] really good" and that "[a]ll I did was turn around and take a glance." And Murphy testified similarly at the preliminary examination that he had had "less than a minute," perhaps "20 to 15 seconds," to view the approaching shooters. These statements were substantially similar to Murphy's statements from the October 16, 2007 interview that he could "[n]ot really" see the shooters' faces clearly because "it was kinda dark" and that he would likely recognize the faces of the two shooters who had initially confronted him and Person but "[p]robably not" the other two.[6]

---

[6] Specifically, the exchange between Murphy and Sergeant Lee Ann Gaspar was transcribed as follows:

> *Sergeant Gaspar*: Would you know their faces if you saw them again?
>
> *Murphy*: Possibly.
>
> *Sergeant Gaspar*: Yes?
>
> *Murphy*: Yes.

12

Given the substantial similarity of Murphy's previous statements to the October 16, 2007 transcript, the October 16, 2007 transcript would not have added a new avenue for impeachment by the defense. With the information it was supplied from the November 8, 2007 interview and preliminary examination, the defense elicited testimony from Murphy regarding the brief time he was able to observe the shooters, and the defense successfully challenged Murphy's claim of having a photographic memory through demonstrations of Murphy's failure to recall appearances and outfits from trial and the day of the shooting. The addition of the October 16, 2007 interview transcript to this issue would not have introduced a new avenue for impeachment, and it would not have greatly increased the strength of the impeachment evidence that did exist such that the jury might have found Murphy's testimony identifying defendants as the shooters incredible.

There is other impeachment evidence within the October 16, 2007 interview transcript that potentially would have presented new avenues for impeachment by the defense, including what time Murphy left the community center, the motive for the initial confrontation with defendants Christian and Hinton, what time the shooting occurred, whether the unknown girl was present during the shooting, whether Person was on a bicycle at the time of the shooting, and whether Person and Murphy were sitting or standing at the

---

*Sergeant Gaspar*: Yes or no?

*Murphy*: Probably not the other two suspects.

*Sergeant Gaspar*: But the original two. Okay. The one that did all the talking?

*Murphy*: Yeah.

13

time of the shooting.[7]  However, I would emphasize that these new avenues for impeachment are still of a similar character as those that were presented at trial (i.e., asserting that Murphy's narrative of events and identification were false because Murphy was not consistent in his reiteration of the shooting).  The October 16, 2007 interview does not, for example, offer evidence that Murphy was not credible for other reasons, like that Murphy was testifying in exchange for leniency in a pending case or that other evidence demonstrates that Murphy's narrative was impossible.  See, e.g., *Napue v Illinois*, 360 US 264, 270; 79 S Ct 1173; 3 L Ed 2d 1217 (1959) (wherein a witness's attempt to obtain a plea deal before testifying was material).

---

[7] I note that some of these inconsistencies are somewhat unclear and, had they been presented at trial, are likely to have been cured by redirect examination.  For example, the majority argues that the October 16, 2007 interview transcript establishes an inconsistency regarding Murphy's description of the initial confrontation between two of the shooters and Person.  The majority notes that, in the October 16, 2007 interview, "Murphy said that one of the men [who initially confronted Person] accused Person of snitching on his mom—unlike his later accounts, where he says one of the men accused Person of snitching on his brother."  This is true—Murphy reported that one of the men who confronted Person asked him, "You the dude that snitched on my moms?" and commented, "My moms don't play with no snitches."  However, in the same interview, Murphy also expanded that "[Person] was around when this dude got caught with the weed . . . [and] [t]hey said he snitched on the dude that got caught with the weed."  Although Murphy's reference to a mother is unique to the October 16, 2007 interview, Murphy does refer to a man who was allegedly snitched on because of a marijuana sale, which is consistent with his later statements.  Accordingly, this statement is not irreconcilable with Murphy's later statements.  The majority also argues that the October 16, 2007 interview transcript shows that Murphy previously stated that the unknown girl was present at the shooting, but a more thorough review of the transcript shows that Murphy was somewhat ambivalent about that fact.  He stated at the beginning of the interview that the girl was not there when the shooting started, but he later answered "I think so" when asked whether the girl was there for the shooting.  While these pieces of the October 16, 2007 transcript present avenues for impeachment, given their ambiguity, their value is low.

14

Moreover, I am unconvinced that these inconsistencies—even combined with the cumulative impeachment evidence described earlier—would have materially undermined Murphy's identification of defendants. Murphy's repeated recollections of the shooting are not identical, but inconsistencies are common in eyewitness testimony and do not necessarily render evidence of those inconsistencies material. See, e.g., *Chenault*, 495 Mich at 157-158 (finding that minor discrepancies in the identification of a shooter in different interviews did not undermine the identification). Murphy's narrative of the event was largely consistent each time he gave it, including the chronology of his movements on the day in question and the descriptions of the shooters. Each time Murphy reiterated his narrative, he described traveling from the community center with his cousin, visiting an uncle's home, meeting Person, wandering around the neighborhood, being confronted by two men regarding snitching and gang affiliations, and being chased and shot at by four persons later on in the evening. The inconsistencies identified by defendants appear to be the result of frailties in human recall, not organized mistruths. Accordingly, I cannot conclude that these minor inconsistencies present in the October 16, 2007 interview transcript would significantly affect Murphy's credibility given his otherwise consistent narrative. Further, none of the inconsistencies presented in the October 16, 2007 interview transcript would cast new light on the strength of Murphy's identifications of defendants as the shooters (for defendant Hinton, at the October 16, 2007 interview, and for the remainder of defendants, at the November 8, 2007 interview). And while the defense did not have access to the October 16, 2007 interview transcript at trial, it is worth noting that defense counsel challenged Murphy's credibility at trial—specifically regarding his

15

identification of defendants and narrative of events—and the jury nonetheless found Murphy to be credible.

Moreover, significant other inculpatory evidence was presented at trial that corroborated Murphy's narrative. That inculpatory evidence included defendant Christian's possession of a weapon involved in the shooting about one week later, Christian's ex-girlfriend and witness to the shooting placing Christian at the scene of the shooting, Christian apologizing to her after the crime, Christian and defendant Edwards repeatedly soliciting their cellmate to murder Murphy, Christian admitting to his cellmate and to another acquaintance that he murdered Person, defendant Hinton stating to his former girlfriend that "his Uncle Kino [Christian] did the murder and also got him involved in the situation," and Hinton and Christian's suspicious phone call on the evening of the shooting. This inculpatory evidence is independent of Murphy's testimony and is unaffected by the October 16, 2007 transcript's potential for impeachment. And although the inculpatory evidence is independent of Murphy's testimony, it does also bolster Murphy's narrative. Notably, the trial judge, who personally and directly observed the admission of this evidence as well as Murphy's testimony and therefore is better suited to judge Murphy's credibility, concluded that the withholding of the evidence contained within the October 16, 2007 interview did not undermine confidence in the jury's verdict. See *People v Lemmon*, 456 Mich 625, 650 n 5; 576 NW2d 129 (1998) (M. F. CAVANAGH, J., concurring) ("The judge sees the witnesses, hears the testimony, and has a special perspective of the relationship between the evidence and the verdict which cannot be recreated by a reviewing court from the printed record.") (quotation marks and citation

16

omitted). On this record, I cannot say that the trial judge's conclusion fell outside the range of reasonable and principled outcomes.[8]

In sum, I believe that the October 16, 2007 interview transcript would not "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 US at 435. Accordingly, I would not award defendants new trials on this basis.

## IV. DEFENDANT HINTON'S ADDITIONAL CLAIM

In addition to his *Brady* claim, defendant Hinton also argues that his trial counsel rendered ineffective assistance of counsel by failing to call two alibi witnesses, Joanna Tedford and Anthony Williams. At trial, Hinton argued that he was not involved in or present at the shooting and had instead been at Tedford's apartment. In support of that alibi, defendant Edwards testified that he saw Hinton in the parking lot near Tedford's apartment between 7:45 p.m. and 11:00 p.m. Additionally, Mickey Jones testified that he saw Hinton leave Tedford's apartment at some point after the shooting. However, the shooting occurred around 8:00 p.m., and neither of these witnesses could testify as to whether Hinton was at Tedford's apartment at this exact time. And despite having filed an alibi notice before trial identifying Tedford herself as a witness, defense counsel never called Tedford. Hinton now asserts that Tedford would have testified that he was present in her apartment during the shooting. Regarding the potential testimony of Williams, Hinton argues that Williams would have testified, contrary to Murphy's testimony, that

_____

[8] "This Court reviews a trial court's decision regarding a motion for relief from judgment for an abuse of discretion." *People v Washington*, 508 Mich 107, 130 n 9; 972 NW2d 767 (2021). "An abuse of discretion occurs when a trial court's decision falls outside the range of reasonable and principled outcomes." *People v Franklin*, 500 Mich 92, 100; 894 NW2d 561 (2017) (quotation marks and citation omitted).

17

Williams was with Person until shortly before the shooting and that Murphy had not been present.

Both the United States and Michigan Constitutions guarantee criminal defendants the right to effective assistance of counsel. US Const, Am VI; Const 1963, art 1, § 20. To demonstrate ineffective assistance of counsel, a defendant must (1) " 'show that counsel's performance was deficient,' " and (2) " 'show that the deficient performance prejudiced the defense.' " *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001), quoting *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984). In proving deficient performance, defense counsel's actions are measured against an objective standard of reasonableness, *People v Reed*, 449 Mich 375, 396; 535 NW2d 496 (1995), and the defendant must overcome "a strong presumption of effective counsel when it comes to issues of trial strategy," *People v Odom*, 276 Mich App 407, 415; 740 NW2d 557 (2007). If a defendant shows that defense counsel's performance fell below an objective standard of reasonableness, the defendant must then "show the existence of a reasonable probability" that, but for this deficient performance, "the result of the proceeding would have been different." *Carbin*, 463 Mich at 600.

Hinton raised this ineffective-assistance-of-counsel claim within a motion for relief from judgment. Generally speaking, a defendant may not raise in a motion for relief from judgment "grounds for relief which were decided against the defendant in a prior appeal . . . ." MCR 6.508(D)(2). Further, if a defendant could have raised the issue on direct appeal, but did not, the defendant must establish "good cause" for the failure to do so, as well as "actual prejudice." MCR 6.508(D)(3). To demonstrate "actual prejudice," a

defendant must show that "but for the alleged error, the defendant would have had a reasonably likely chance of acquittal[.]"  MCR 6.508(D)(3)(b)(*i*).

The Court of Appeals rejected Hinton's claim, reasoning with regard to Tedford that appellate counsel had previously raised this claim on direct appeal—thus barring consideration under MCR 6.508(D)(2)—and that Tedford's testimony was superfluous because Hinton's alibi was established through the testimony of Jones and defendant Edwards instead.  The Court of Appeals found Hinton's argument with regard to Williams similarly meritless, reasoning that Williams's testimony would not have challenged the prosecution's witnesses.

I disagree, and I would have remanded for an evidentiary hearing to further develop the factual record on this argument.  Although defense counsel on direct appeal did technically raise an ineffective-assistance-of-counsel argument as to Tedford, Hinton makes a convincing argument that defense counsel's performance in that matter was deficient.  Defense counsel initially moved for a remand in the Court of Appeals, but failed to identify any particular deficiency for which factual development was required.  Accordingly, the motion was denied.  Defense counsel subsequently filed a supplemental brief with more thorough argument, but failed to renew the motion to remand.  Under these circumstances, I do not believe the procedural bar of MCR 6.508(D)(2) should apply.

Further, although Hinton's alibi that he was at Tedford's apartment at the time of shooting was generally supported by Jones's and Edwards's testimony, neither of these witnesses testified as to where Hinton was at the exact time of the shooting.  Although the witnesses could place him generally near Tedford's apartment on the evening in question, their testimony did not conclusively establish Hinton's whereabouts at the time of the

19

shooting. Tedford's testimony may provide the specificity that the testimony elicited from Jones and Edwards at trial lacked. Williams's proposed testimony—that he was with Person in the time leading up to the shooting—may also be probative of Hinton's involvement in the shooting. Given that the additional inculpatory evidence presented at trial was arguably weakest against Hinton as compared to his fellow defendants, it is also possible that Hinton could succeed in proving that he received deficient performance of counsel and that the deficiency prejudiced him.

To be clear, I express no opinion regarding whether Hinton should receive relief pursuant to his ineffective-assistance-of-counsel argument. However, considering the circumstances of the direct appeal, I believe Hinton has made a sufficient offer of proof to warrant an evidentiary hearing to further develop the record.

## V.  CONCLUSION

Although the prosecution in this case failed to disclose Murphy's October 16, 2007 interview transcript to defendants before trial, there is not a reasonable probability that, had defendants received this evidence, the trial result would have been different. Accordingly, I disagree with the majority's conclusion that the withheld evidence was material, and I would not grant new trials to defendants. I would, however, remand for an evidentiary hearing to further explore defendant Hinton's ineffective-assistance-of-counsel argument.

Elizabeth T. Clement
Brian K. Zahra
David F. Viviano

20